# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

### No. ACM 39525

_____

### UNITED STATES
*Appellee*

**v.**

### Timothy M. WILSEY
Airman First Class (E-3), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

Decided 26 November 2019

_____

*Military Judge:* James R. Dorman (arraignment); Vance H. Spath.

*Approved sentence:* Dishonorable discharge, confinement for life with eligibility for parole, forfeiture of all pay and allowances, reduction to E-1, and a reprimand. Sentence adjudged 11 April 2018 by GCM convened at Offutt Air Force Base, Nebraska.

*For Appellant:* Major Mark C. Bruegger, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Michael T. Bunnell, USAF; Mary Ellen Payne, Esquire; Andrew J. Quillen (civilian intern).[1]

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Judge KEY delivered the opinion of the court, in which Judge POSCH joined. Senior Judge J. JOHNSON filed a separate opinion concurring in part and in the result.

_____

[1] Mr. Quillen was a legal intern with the Air Force Legal Operations Agency and was at all times supervised by attorneys admitted to practice before this court.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

KEY, Judge:

A general court-martial composed of a military judge convicted Appellant, in accordance with his pleas and pursuant to a pretrial agreement, of premeditated murder and desertion, in violation of Articles 118 and 85, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 918 and 885.[2] The court-martial sentenced Appellant to a dishonorable discharge, confinement for life without eligibility for parole, forfeiture of all pay and allowances, reduction to the grade of E-1, and a reprimand. The convening authority reduced Appellant's confinement to life with eligibility for parole in accordance with the pretrial agreement, but otherwise approved the sentence as adjudged.

On appeal, Appellant alleges he was denied a speedy trial in violation of Article 10, UCMJ, 10 U.S.C. § 810. Appellant personally raises two additional issues which we have carefully considered and determined are without merit and warrant no discussion or relief.[3] Finding no prejudicial error, we affirm the findings and sentence.

## I. BACKGROUND

Just eight months after he entered active duty, Appellant murdered 20-year-old Airman First Class (A1C) Rhianda Dillard in her on-base dormitory room on the evening of Friday, 29 July 2016. Earlier in the day, both Appellant and A1C Dillard graduated from the First Term Airman Center, as the two Airmen had both recently arrived at their first permanent duty station, Offutt Air Force Base (AFB), Nebraska.

_____

[2] All references in this opinion to the Uniform Code of Military Justice (UCMJ) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). Pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), Appellant alleges: (1) that he was subjected to illegal pretrial punishment, and (2) that his trial defense counsel were ineffective because they did not request sentencing credit for the purported illegal pretrial punishment.

Appellant met A1C Dillard at Offutt AFB, and they exchanged phone numbers and dormitory room numbers, meeting several times to talk and watch television. At some point, Appellant decided to murder A1C Dillard.

In a journal seized by military investigators and entered as evidence at trial, Appellant explicitly described how he killed A1C Dillard. Using pseudonyms for A1C Dillard, Appellant wrote in the journal about how he first did his laundry before going to her room because, in part, "it would have been awkward doing laundry immediately after killing someone." He packed some bags, put on a Joker t-shirt because he "[t]hought it would be ironic and a little funny to kill her while wearing the shirt of a fictional sociopath killer," and then walked to A1C Dillard's room, D112 in Turner Hall.

According to Appellant's journal entries, he and A1C Dillard talked for about an hour until they got on her bed to watch a movie. Appellant, under the guise of making "an advance" on A1C Dillard, got progressively closer to her until they were sitting side-by-side, leaning on each other. She put her leg over his and he put his arm over her shoulder. Appellant then put her in a chokehold and strangled her to death.

Looking over A1C Dillard's body, Appellant determined he wanted to see her breasts, so he lifted up her shirt and bra. Describing her breasts in his journal, Appellant wrote that he "kind of wanted to" sexually assault her body, but decided against it. Before leaving, Appellant stole all the money out of A1C Dillard's wallet as well as cookies she mentioned having to Appellant when she was still alive. Appellant wrote, "So I took a murdered girls [sic] [O]reos, and laughed at how absurd it was while I did it. . . . I kind of wish I had grabbed an ID or something to keep as a trophy of sorts, but oh well, I'll think about it next time."

Appellant left A1C Dillard's room shortly after 0100 hours Saturday morning, drove his car off the base to a nearby Wal-Mart to buy some supplies, and set out on a drive to the east coast. A1C Dillard's body was not discovered until Monday morning when she did not report for duty. On Tuesday, four days into his trip, Appellant sent a text message to another Airman at Offutt AFB reading, "D112 turner. My bad," referring to A1C Dillard's room number and dormitory building. Appellant wrote in his journal that he thought sending the message would "be funny" and it would let him "take some kind of credit for the murder." The message led law enforcement agents to suspect Appellant's involvement in A1C Dillard's death.

Chronicling his cross-country trip in his journal, often in banal detail, Appellant described stopping to sightsee in Kansas City, buying a GPS device, people-watching at a shopping mall, talking to people on college campuses, hiking in state parks, visiting a beach, and going to a town festival. He also

wrote about how his car's temporary tags were going to expire and that he could "solve [his] vehicle situation" by either stealing license plates or by killing someone and stealing their car. Appellant went on to explain that he could implement this latter option by killing an unsuspecting vehicle owner, fashioning a "for sale" sign with poster board and a Sharpie, placing the body in the trunk of his car, positioning his car so that it was facing the road, then driving out of the state in the stolen car. He bought poster board and a Sharpie at a Dollar Tree, along with "a rope for strangling . . . just in case the urge hit [him], or [he] found the perfect victim and car." Reflecting at one point on how he missed his Air Force dormitory with its "free food" and television, Appellant wrote, "[m]aybe this would be more fun if I killed more people and got another adrenaline rush," noting that "nobody ever got famous for killing just [one] person." Elsewhere in the journal, he described different ways to murder people and how he was disappointed in himself that he had not killed anyone else.

Thirteen days after fleeing the base, Appellant was apprehended at a hotel in Emporia, Virginia. His journal was with him in the room, and various items of evidence were found in his car parked outside, including a Joker t-shirt, poster board, rope, and a Sharpie. Appellant was informed by an Air Force Office of Special Investigations (AFOSI) agent that he was suspected of murder, at which point Appellant requested a lawyer.

Appellant's journal does not disclose much of a motive for the murder other than that he wanted to kill someone. As to why he chose A1C Dillard, Appellant was indifferent: "I didn't hate her, nor did I love her. I harbored no ill will towards her at all. The only thing she ever did wrong was try to be my friend." He also wrote, "[i]t's just what I want to do, so I did it," "I just enjoy killing, simple as that," and "I killed someone, and hopefully will kill a few more."

## II. DISCUSSION

### A. Additional Background

Appellant was placed into pretrial confinement on 12 August 2016. Five days later, a pretrial confinement review officer concluded Appellant should remain confined. From the discovery of A1C Dillard's body through 29 December 2016, AFOSI agents conducted a number of investigative steps, including searching and collecting evidence from Appellant's and A1C Dillard's rooms, reviewing electronic key logs for their doors, collecting and reviewing security camera footage, extracting and reviewing data from Appellant's GPS device, retracing Appellant's cross-country route, extracting and reviewing cell phone data, extracting and reviewing data from Appellant's and A1C Dillard's computers, reviewing social media accounts, and conducting

more than 40 interviews. An autopsy and sexual assault forensic exam were both conducted on A1C Dillard, and the final autopsy report was published on 6 September 2016, which was the 25th day of Appellant's pretrial confinement.[4]

On 8 September 2016 (day 27 of Appellant's pretrial confinement), AFOSI agents sent a variety of items to the United States Army Criminal Investigation Laboratory (USACIL) for analysis, including the clothing Appellant was suspected of wearing at the time of the murder, the clothing A1C Dillard was wearing when her body was discovered, a sexual assault evidence collection kit, evidence found in Appellant's room, and DNA samples obtained from Appellant and A1C Dillard. Electronic items, such as the GPS device, A1C Dillard's laptop computer, and a computer found in Appellant's room were sent to the Defense Computer Forensics Laboratory (DCFL) for analysis.

On 19 September 2016 (day 38), trial defense counsel requested the appointment of an expert consultant in forensic psychology, asserting that the "independent forensics testing, documentary analysis, biopsychosocial history development and witness interviews in a case of this magnitude is well beyond the existing capabilities of the defense." The Defense requested the convening authority approve initial funding for at least 120 hours of consultation services.

On 22 September 2016 (day 41), trial defense counsel requested the appointment of a confidential defense investigator to investigate not just the alleged offenses, but Appellant's "entire life and background." Trial defense counsel asserted in this request that to competently represent Appellant, their investigation would span every installation Appellant's career-Air Force father had been stationed at, the homes Appellant lived in, the schools he attended, "even the streets of base housing he played on as a child." Counsel further asserted they had insufficient capabilities to investigate the alleged offenses, describing the task as "complex and far-reaching" with "far too many witnesses and too many areas of inquiry" for trial defense counsel to pursue without assistance. In so arguing, trial defense counsel pointed to "[t]he severity of the allegations" and the resources expended by the Government in its investigation in "a case of this magnitude." The Defense requested the convening authority approve initial funding for 160 hours of investigative

---

[4] Days of confinement in this opinion do not include the date Appellant entered pretrial confinement.

services. During this time, AFOSI agents continued to interview family members and others who knew A1C Dillard and Appellant.

On 4 October 2016 (day 53) and 6 October 2016 (day 55), USACIL published its fingerprint and handwriting reports, respectively. These reports indicated Appellant had written the entries in the journal seized in the Emporia hotel room. The fingerprint report also identified Appellant's fingerprints on an Oreo cookie package seized from Appellant's dormitory room. On 7 October 2016—56 days after Appellant was initially confined—trial defense counsel asserted Appellant's Sixth Amendment right to a speedy trial within a seven-page discovery request. The demand was accompanied by the caveat that trial defense counsel could not prepare for trial without the requested discovery.

On 12 October 2016 (day 61), trial counsel met with AFOSI agents to discuss the status of their investigation, and the agents explained they were waiting on the results of both a scientific analysis of samples taken from A1C Dillard's body and a digital analysis of data stored on a computer and a GPS device seized from Appellant. The agents anticipated both analyses would be completed by 23 November 2016.

On 2 November 2016 (day 83), the Government sought an exclusion of 43 days from the Rule for Courts-Martial (R.C.M.) 707 speedy trial clock, arguing that forensic analysis was "crucial to an intelligent decision as to case disposition," as a decision had not yet been made whether to seek the death penalty. The requested period of exclusion ran from the 12 October 2016 meeting with the investigators (day 61) through the projected completion of the forensic analyses, 23 November 2016 (day 103). The special court-martial convening authority approved the exclusion on 7 November 2016 (day 87), finding Appellant's case to be "complex" and calling for additional time to complete forensic analyses.[5]

On 16 November 2016 (day 96), trial counsel learned the analysis of the samples taken from A1C Dillard's body was behind schedule and would not be completed until 9 December 2016 (day 119). Pursuant to the Government's request, the special court-martial convening authority approved an additional 16-day exclusion from the R.C.M. 707 clock on 23 November 2016 (day 103), which comprised the period between the originally anticipated analysis-completion date (23 November 2016) and the new anticipated completion date

---

[5] The parenthetical day counts in this opinion do not reflect exclusions of time from the R.C.M. 707 speedy trial clock. Rather, they are the number of days that elapsed after Appellant's entry into pretrial confinement.

(9 December 2016). DCFL published a report on 6 December 2016 (day 116) revealing computer message activity between the two Airmen. The DNA report was completed on 9 December 2019 and confirmed the presence of A1C Dillard's DNA on Appellant's Joker t-shirt, but did not find any evidence Appellant had sexually assaulted A1C Dillard.

Charges were preferred on 13 December 2016 (day 123), four days after the DNA report was published, and trial counsel asserted they were ready to proceed with the Article 32, UCMJ, preliminary hearing on 29 December 2016 (day 139). Trial defense counsel, however, were not available until 16 February 2017 (day 188), so the hearing was scheduled for that day. On 3 January 2017 (day 144), the special court-martial convening authority excluded 49 days from the R.C.M. 707 clock to account for the time between the date the Government was ready to proceed and the Defense's first-available date.

On 13 January 2017 (day 154), trial defense counsel requested appointment of an expert consultant in forensic pathology to assist the Defense in understanding the autopsy report, and also requested reconsideration of their prior requests for a forensic psychologist and defense investigator. These requests were denied on 23 January 2017 (day 164).[6] The denials were styled as applying to "pre-Article 32 hearing" requests.

The same day as the date of the denials, the special court-martial convening authority ordered a board be convened to conduct an inquiry into Appellant's mental capacity and mental responsibility under R.C.M. 706. The board evaluated Appellant on 30 and 31 January 2017 (days 171 and 172), and the board's report was turned in on 1 February 2017 (day 173), finding Appellant both mentally responsible at the time of the offenses and mentally capable of cooperating intelligently in his defense.

The Article 32 preliminary hearing was held on 16 February 2017 (day 188), and trial defense counsel filed objections later that day.

The preliminary hearing officer completed his report on 24 February 2017 (day 196), recommending Appellant be tried for premeditated murder and desertion by general court-martial. Appellant and his trial defense counsel received a copy of the report on 8 March 2017 (day 208).

On 13 March 2017 (day 213), trial defense counsel requested a two-day extension to respond to the Article 32 preliminary hearing officer's report.

---

[6] There is no indication in the record of trial that the initial requests for the psychologist and investigator had been previously acted on by the Government.

The convening authority granted the extension and excluded those two days from the R.C.M. 707 clock, allowing Appellant to file his objections to the preliminary hearing on 15 March 2017 (day 215). The following day (day 216), the general court-martial convening authority referred Appellant's charges for a non-capital trial. A military judge was detailed for arraignment purposes on 20 March 2017 (day 220), and Appellant was arraigned on 22 March 2017 (day 222).

On 28 March 2017 (day 228), trial defense counsel renewed their request for the appointment of an expert consultant in forensic pathology. The same day, trial defense counsel also renewed their request for an expert consultant in forensic psychology, explaining:

> The amount of independent forensics testing, documentary analysis, biopsychosocial history development and witness interviews in a case of this magnitude is well beyond the existing capabilities of the defense. It should be apparent that in the instant case, defense counsel does not possess the ability to fully investigate the possibility of mitigative evidence for sentencing should the need arise. . . . The defense is unable to adequately prepare our case without an expert consultant because we simply do not have the knowledge and experience in this area.

These requests were granted on 14 April 2017 (day 245). At some point, the Defense was appointed a confidential investigator, but the record of trial does not reflect precisely when this occurred.[7]

Meanwhile, trial counsel requested their own expert consultant in the field of forensic psychology on 11 April 2017 (day 242), a request that was granted on 18 April 2017 (day 249).

On 21 April 2017 (day 252), the chief military judge sent the parties a memorandum confirming that he had detailed himself as the military judge for Appellant's trial, excusing the military judge who presided over the arraignment.[8] On 27 April 2017 (day 258), the military judge held an R.C.M.

---

[7] Appellant's brief on appeal states the investigator was appointed on 14 April 2017, the same day as the psychologist and pathologist. This date is apparently derived from trial counsel's speedy trial motion response.

[8] We note the 30-day period between arraignment and the confirmation of the military judge's detailing to the case for trial. According to the timeline prepared by trial counsel for their response to the Defense's speedy trial motion, trial counsel contacted the chief circuit trial judge on 8 April 2017 seeking the detail of a military judge and tried to coordinate motion and trial dates with the Defense about that same

*(Footnote continues on next page)*

802 conference, during which trial defense counsel stated they were not prepared to discuss dates for even a motions hearing, pointing to the fact they had only recently had expert consultants appointed. Trial defense counsel explained they "needed time to consult with these experts to identify potential issues in the case." At some point after the conference, trial defense counsel indicated their first available date for a motions hearing was more than 125 days later, on 2 September 2017 (day 386). Ultimately, the military judge scheduled the motions hearing for 2 October 2017 (day 416), noting that he hoped the additional time would avoid the need for any additional motions hearings. The military judge told the parties he could hear motions sooner, in July or August of 2017, and that the parties should advise him if other, earlier dates became available to them. Trial defense counsel neither objected to the 2 October 2017 motion date nor requested the hearing be moved up to July or August 2017.

On 12 May 2017 (day 273), trial defense counsel requested supplemental funding for their appointed forensic psychologist, a request which was granted by the Government in an undated memorandum.

On 8 June 2017 (day 300), the Government requested the appointment of a forensic pathologist, and this request was granted on 22 June 2017 (day 314). Also on 8 June 2017, trial defense counsel requested appointment of expert consultants in the fields of handwriting analysis, "forensic biology/DNA," latent fingerprint analysis, and computer forensics, explaining that the Defense was unable to adequately prepare their case without such consultants. The request for a computer forensic expert was approved on 25 July 2017 (day 347). The request for the handwriting consultant was approved on 3 August 2017 (day 356), and experts in DNA and latent fingerprint analyses were approved in undated memoranda.

Air Force investigators completed and published their report of investigation on 31 July 2017 (day 353).

On 10 August 2017 (day 363), Government counsel requested appointment of a forensic computer expert, and that request was granted on 29 August 2017 (day 382). Meanwhile, trial defense counsel submitted a second discovery request on 28 August 2017 (day 381), a third request on 1 September 2017 (day 385), and a supplemental funding request for their appointed investigator on 8 September 2017 (day 392).

---

time. There is no evidence in the record, however, of trial counsel doing either of these things. We remind military justice practitioners that statements of and proffers by counsel are not evidence.

Trial defense counsel filed a motion to dismiss all charges and specifications for speedy trial violations under R.C.M. 707, the Sixth Amendment, and Article 10, UCMJ, on 11 September 2017 (day 395). During an Article 39(a), UCMJ, session beginning on 2 October 2017 (day 416), the military judge heard this motion along with a motion to suppress evidence, including Appellant's journal, as fruit of an unlawful apprehension (the law enforcement agents who apprehended Appellant did not have a warrant to enter his hotel room). He issued his rulings denying both motions on 4 October 2017 (day 418). During the hearing on the speedy trial motion, the Government called an AFOSI agent who testified some 40 to 50 agents from 7 to 12 AFOSI detachments were involved in Appellant's investigation, and between 25 and 35 different items had been sent to USACIL and DCFL for forensic analysis. The agent further explained investigators had weekly conversations with personnel in the legal office about the progress of the investigation.

After receiving the military judge's rulings at the end of the Article 39(a) session, the parties indicated they had not had any discussion about potential trial dates, and the military judge directed them to plan on an R.C.M. 802 conference the following week in order to set a trial date or an additional hearing date to litigate motions. At some point thereafter, the parties agreed to set a trial date of 5 April 2018 (day 601). Trial started on 5 April 2018, and Appellant entered his plea of guilty that day. He was sentenced on 11 April 2018 (day 607).

Between the motions hearing and trial, Appellant requested—and the Government approved—supplemental funding for his latent fingerprint expert, forensic biology/DNA expert, handwriting expert, defense investigator, and forensic computer expert.

In denying Appellant's speedy trial motion, the military judge explained that the premeditated murder offense involved physical, digital, and forensic evidence, as well as an autopsy and "a journal that suggested some aspects of sexual assault." He noted Appellant had not given a statement to law enforcement, and there were no eyewitnesses to the charged offenses. In looking at the periods of time excluded from the R.C.M. 707 clock pursuant to the Government's request, the military judge found those periods "eminently reasonable for forensic and scientific testing."

With respect to Appellant's Article 10 and Sixth Amendment claims, the military judge determined the amount of time that "actually counts" as a delay was under 200 days. He cited several reasons for the delay:

> investigation of the crime; processing of forensic evidence; defense schedules for the Article 32; defense requested time to respond to the [Article] 32; a judge available date of a few weeks

that was [his] own calendar; some delay for the Article 32 report to be written[;] . . . a short delay for referral.[9]

(Footnote added). The military judge found the length of delay "reasonable given the nature of the case, the nature of the evidence and the diligent processing . . . by the [G]overnment," which "took constant, reasonable, normal steps to move this case to trial." The military judge ruled Appellant had not alleged any abnormal stress caused by his pretrial confinement conditions, nor had Appellant demonstrated any prejudice resulting from the delay. The military judge determined that by the Government taking the time to rule out a sexual assault, Appellant was spared eligibility for the death penalty, and that the Government "systematically and reasonably moved this case towards trial from the outset."

**B. Law**

Under Article 10, UCMJ, once an accused is ordered into arrest or confinement prior to trial by court-martial, "immediate steps shall be taken . . . to try [the person] or to dismiss the charges and release [the person]." 10 U.S.C. § 810. This calls for a "more exacting speedy trial demand than does the Sixth Amendment." *United States v. Thompson*, 68 M.J. 308, 312 (C.A.A.F. 2010) (quoting *United States v. Mizgala*, 61 M.J. 122, 124 (C.A.A.F. 2005)).

An unconditional guilty plea waives speedy trial issues under the Sixth Amendment[10] and R.C.M. 707. *United States v. Tippit*, 65 M.J. 69, 75 (C.A.A.F. 2007) (citing *Mizgala*, 61 M.J. at 125). Speedy trial issues under Article 10, however, are not waived on appeal by virtue of a guilty plea so long as an appellant raises and litigates the Article 10 claim at trial. *Id.*

---

[9] Presumably, the military judge started his calculations with the 418 days Appellant had been in pretrial confinement and then subtracted out the two periods of time excluded by the convening authority from R.C.M. 707 analysis at the Government's request (59 days), the 49 days the Defense was not available for the preliminary hearing, the 2 additional days requested by the Defense to review the preliminary hearing report, and the time between the 27 April 2017 R.C.M. 802 conference and the date the Defense agreed to for a motions hearing, 2 September 2017 (138 days). By so subtracting, the amount of time counted as a delay by the military judge would amount to 170 days. Considering the military judge then described some of these excluded periods as "reasons for delay," we cannot determine with precision how the military judge arrived at his "under 200" figure. Because exclusions from the R.C.M. 707 clock are not dispositive in an Article 10 analysis, we need not resolve the military judge's calculations.

[10] U.S. CONST. amend. VI.

We review whether an appellant was denied a speedy trial under Article 10 de novo. *United States v. Cooley*, 75 M.J. 247, 259 (C.A.A.F. 2016) (quoting *United States v. Cossio*, 64 M.J. 254, 256 (C.A.A.F. 2007)) (additional citation omitted). We will only reverse a military judge's findings of facts if they are clearly erroneous. *Mizgala*, 61 M.J. at 127 (citations omitted).

Article 10 requires the Government to exercise "reasonable diligence in bringing the charges to trial." *Cooley*, 75 M.J. at 259 (quoting *Mizgala*, 61 M.J. at 127, 129). Article 10 does not, however, require "constant motion" on the Government's part. *Id.* (citing *Mizgala*, 61 M.J. at 127, 129). Reasonable diligence is assessed under the four-factor framework set out in *Barker v. Wingo*, 407 U.S. 514 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) whether the appellant made a demand for a speedy trial; and (4) prejudice to the appellant." *Cooley*, 75 M.J. at 259 (citing *United States v. Wilson*, 72 M.J. 347, 351 (C.A.A.F. 2013)). "None of the four *Barker* factors alone are a 'necessary or sufficient condition to the finding of a deprivation of the right of speedy trial.'" *Cooley*, 75 M.J. at 259 (quoting *Barker*, 407 U.S. at 533).

In the context of an otherwise active prosecution, "short periods of inactivity" do not result in an Article 10 violation, and we assess "the proceeding as a whole and not mere speed." *Thompson*, 68 M.J. at 312 (quoting *Mizgala*, 61 M.J. at 127, 129). The standard "is reasonable diligence, not textbook prosecution." *United States v. Schuber*, 70 M.J. 181, 188 (C.A.A.F. 2011).

On one hand, when "the Government could readily have gone to trial much sooner than some arbitrarily selected time demarcation but negligently or spitefully chose not to," there may be an Article 10 violation. *United States v. Kossman*, 38 M.J. 258, 261 (C.M.A. 1993). On the other, it is not unreasonable for the Government to thoroughly investigate an accused and collect and analyze all the evidence in a case. *Cossio*, 64 M.J. at 257 (citation omitted). The complexity of a case is recognized as a legitimate basis for not rushing to trial. *United States v. Hatfield*, 44 M.J. 22, 23 (C.A.A.F. 1996) (citation omitted). Moreover the trial defense team must also remain cognizant of an accused's desire to proceed expeditiously to trial, as "the right to speedy trial is a shield, not a sword," and an accused may not cause or agree to delay and then seek dismissal because of that delay. *United States v. King*, 30 M.J. 59, 66 (C.M.A. 1990) (citations omitted).

**C. Analysis**

Appellant preserved his Article 10 claim with respect to the period of time he litigated at trial, which is the period between the initiation of his pretrial confinement on 12 August 2016 and the date the military judge denied his speedy trial motion, 4 October 2017 (day 418). Although more than 180 addi-

tional days passed before his trial commenced on 5 April 2018, Appellant did not contest this period at trial, and it is therefore waived by virtue of his unconditional guilty plea. *See Tippit*, 65 M.J. at 75.

### 1. The length of the delay

The threshold for conducting the *Barker* analysis is to first determine whether there is "a period of delay that appears, on its face, to be unreasonable under the circumstances." *Cossio*, 64 M.J. at 257 (quoting *United States v. Smith*, 94 F.3d 204, 208–09 (6th Cir. 1996)). Our superior court has found 117 days sufficient to trigger full speedy trial analysis. *See id.*; *see also Wilson*, 72 M.J. at 352 (174 days); *Thompson*, 68 M.J. at 312 (145 days). We conclude that spending 418 days in pretrial confinement to get to the point where two relatively straightforward motions are decided appears to be unreasonable on its face, and this conclusion triggers our Article 10 analysis under *Barker*.

Having triggered a full analysis, we begin with assessing the length of the delay in which we consider the seriousness of the offenses involved, the complexity of the case, the availability of proof, and other factors such as whether Appellant was informed of the accusations against him, whether pretrial confinement procedures were complied with, and the Government's responsiveness to any request for reconsideration of Appellant's placement into pretrial confinement. *See Cooley*, 75 M.J. at 260 (quoting *Schuber*, 70 M.J. at 188).

Appellant was informed of the accusations against him when he was apprehended in the hotel room in Emporia, he has not alleged pretrial confinement procedures were not complied with, and he did not request reconsideration of the decision to place him in pretrial confinement.

The seriousness of the charged offenses—premeditated murder and desertion terminated by apprehension—is indisputable. Indeed, a conviction for premeditated murder under Article 118, UCMJ, is not only subject to the death penalty, but it carries a mandatory *minimum* sentence of imprisonment for life. Few offenses under the UCMJ are comparably severe.

In addition to the seriousness of his charged crimes, Appellant's case was far from simple. Investigators and trial counsel initially faced a seemingly motiveless murder with no witnesses, murder weapon, or confession. Without the journal and results of the later forensic analyses, the only evidence the Government initially had linking Appellant to the murder was security camera footage placing Appellant in A1C Dillard's room two days before her body was discovered along with his "My bad" text message. Appellant's journal provided substantial proof incriminating Appellant, but the Government's ability to use the journal at trial was uncertain in the face of trial defense counsel's aggressive attempt to suppress the journal as the fruit of an unlaw-

ful apprehension. The journal itself suggested additional criminal conduct, such as Appellant's proposals to commit other murders, one of which revolved around stealing a new car—a plan which included a rope, poster board, and a marker, all of which were discovered in Appellant's car when he was apprehended. Appellant also described in his journal how he pondered sexually assaulting A1C Dillard's lifeless body. Appellant's own words in his journal suggested additional investigative avenues government agents logically pursued, including whether or not he had sexually assaulted A1C Dillard. This aspect of the investigation likely determined whether or not Appellant would face the death penalty, and seeking to conclusively determine whether he had so assaulted her was a natural investigative effort which added to the complexity of the case.[11] Similarly, ascertaining the scope of Appellant's criminal conduct, especially considering he had spent almost two weeks traversing the country running from his crime, further complicated the investigation.

Although the delay of 418 days is sufficient to trigger the *Barker* analysis, the length of delay under the facts presented here was appropriate under the circumstances, and this factor weighs in the Government's favor.

**2. The reasons for delay**

Whether a particular delay is held against the Government depends on the reason for the delay, and valid reasons for delay are typically considered justified. *Cooley*, 75 M.J. at 260 (quoting *Barker*, 407 U.S. at 531). The Government's thorough investigation of a case is a valid reason for a delay. *Id.* (quoting *Cossio*, 64 M.J. at 258). Delays caused by the Defense are held against Appellant, not the Government. *Id.* (quoting *Vermont v. Brillon*, 556 U.S. 81, 90 (2009)). We will analyze the reasons for the delay during the following periods as this case progressed to trial: Appellant's entry into pretrial confinement through the preferral of charges; preferral through referral of charges; and referral through the October 2017 motions hearing.

### a. Pretrial confinement through preferral

From the date Appellant was placed into pretrial confinement until charges were preferred, 123 days passed. When Appellant was apprehended, investigators for the first time learned of Appellant's journal in which he not only detailed his murder of A1C Dillard and his flight from Offutt AFB, but in which he also discussed how he considered sexually assaulting A1C Dillard

---

[11] Appellant contends that because he wrote in his journal he chose not to sexually assault A1C Dillard, the Government did not need to investigate whether such an assault occurred. We find this argument unpersuasive.

and how he contemplated killing others as he eluded the authorities. This led agents to seek corroboration of the journal's entries, as well as to confirm that Appellant was in fact the author of the journal, while continuing their ongoing investigation into A1C Dillard's death and Appellant's desertion.

In addition to interviewing potential witnesses and Appellant's and A1C Dillard's acquaintances and family members, agents directly engaged in and sought external assistance in conducting specialized analyses of evidence. An autopsy was completed and an accompanying report was published on the 25th day of Appellant's pretrial confinement. Two days later, agents sent evidence to USACIL for DNA and serological analysis, including items collected in the sexual assault forensic examination of A1C Dillard. Appellant's cell phone, GPS device, and computer were sent to DCFL for analysis. The journal was sent to USACIL to be analyzed by fingerprint and handwriting experts whose reports were published by the 55th day of Appellant's confinement. The DNA and serological analyses were expected to be completed on day 103, but they were ultimately not completed until day 119 due to the analysts falling behind schedule. Once the DNA and serological analyses were completed, charges were preferred four days later, despite the fact AFOSI agents had not yet completed their report of investigation, a document which would not be finalized until well over 200 days later.

Considering the severity of the charged offenses and the complex, multifaceted nature of the evidence in this case, we do not find a period of 123 days unreasonable for the Government to thoroughly investigate the offenses, complete forensic analyses, marshal and analyze the evidence, and finalize charges. Our assessment is buttressed by the fact the Government had to carefully scrutinize the evidence in order to make the determination of whether or not to seek the death penalty—a determination that is understandably neither lightly made nor quickly arrived at.

### b. Preferral through referral

The next period of time, between preferral and referral of charges (days 123 and 216, respectively), lasted 93 days. Once charges were preferred, trial counsel indicated they were prepared to proceed with the preliminary hearing on 29 December 2016 (day 139), but the Defense was unavailable until 16 February 2017 (day 188). Thus, trial counsel requested a preliminary hearing date 16 days after preferral. The record does not explain why trial counsel were not ready to proceed with the preliminary hearing immediately after preferral. Considering the Government was in control of the investigation and preferral of charges, trial counsel should have been prepared for the hearing upon preferral of charges, save a short period of time to fulfill administrative requirements. Regardless of trial counsel's ready date, however, the Defense was not prepared to proceed for 65 days after preferral, which was 49

days after the date trial counsel proposed. As a result, the 16-day period during which the Government was not ready to proceed with the hearing was ultimately subsumed by the fact the Defense was not ready to proceed. While waiting to conduct the preliminary hearing, the special court-martial convening authority ordered, and medical professionals convened and completed, a mental capacity and responsibility inquiry under R.C.M. 706.

The preliminary hearing was held the first day the Defense was ready to proceed, and the preliminary hearing officer completed his report eight days later—a reasonable amount of time considering the volume and complexity of the evidence. After the report was completed, however, Appellant and his counsel were not served with copies of the report for another 12 days, a delay which is unexplained in the record. Upon receiving the report, trial defense counsel took their allotted five days to review and prepare objections to it, and they obtained an additional two-day extension to submit those objections. The day after this seven-day reply period, the general court-martial convening authority referred charges of premeditated murder and desertion.

In allotting these time periods to the parties, 51 of the 93 days between preferral and referral consisted of the Defense not being prepared to proceed with the preliminary hearing (49 days) and taking an additional 2 days to review the preliminary hearing officer's report. On the Government's side, trial counsel were not ready to proceed with the preliminary hearing for 16 days after preferral, and the Government took 12 days to transmit the preliminary hearing officer's report to the Defense, for a total of 28 days. In sum, during the 93 days between preferral and referral, 51 days of delay are attributable to the Defense, while 28 days are attributable to the Government. The remaining 14 days consist of the 8 days used to prepare the preliminary hearing report, the 5 days allotted to Appellant to review the report, and the day of referral. Considering the severity of the charges and the complexity of the case, the Defense's additional two-day request to respond to the preliminary hearing officer's report is more than reasonable. The Government's 12-day delay in executing the administrative task of transmitting the completed preliminary hearing report to the Defense, on the other hand, is unexplained and unjustified.

### c. Referral through motions hearing

Four days after charges were referred, a military judge was detailed to arraign Appellant, and that arraignment occurred two days later. Thus, six days elapsed between referral of charges and arraignment, which we find to be a reasonable period.

An unexplained delay occurred between arraignment and the detailing of a military judge for trial, a period which spanned 30 days. Once the military

judge was detailed, an additional six days passed before the military judge conducted an R.C.M. 802 conference to discuss, among other things, a trial schedule. At this conference, trial defense counsel would not discuss dates for a motions hearing, much less trial, due to their concern over not having had experts appointed to assist in their trial preparation. After the conference, the Defense eventually identified 2 September 2017 as the date they would be prepared to hold a motions hearing, which was 128 days after the R.C.M. 802 conference and 164 days—more than five months—after Appellant's arraignment.

Despite the Defense's availability on 2 September 2017 for motions, the military judge did not schedule the hearing until 30 days later on 2 October 2017. We cannot find any clear explanation in the record for this additional 30-day delay, although at the motions hearing the military judge referred to "a judge available date of a few weeks that was [his] own calendar," leading us to surmise the judge was not available for the hearing in September. In his scheduling order, the military judge indicated the delay was for the purpose of giving the parties the time they needed to prepare for the hearing in the hopes only one motions hearing would be needed for the case. The military judge advised the parties he could hold the motions hearing two to three months earlier, but there is no indication in the record either the Government or the Defense sought to take advantage of an earlier hearing.

Between arraignment and the beginning of the 2 October 2017 motions hearing, 194 days elapsed. Of this time, 66 days are essentially attributed to the Government—the 30-day delay in detailing a military judge after arraignment, 6 days between the military judge being detailed and his R.C.M. 802 scheduling conference, and 30 days between the Defense's ready date and the date the military judge set for the motions hearing.[12] Trial defense counsel explicitly stated they were unprepared to proceed until 2 September 2017, which means at least 128 days of this period are attributable to defense delays. Given that the Defense's explanation for being unwilling to discuss hearing dates at the 27 April 2017 conference was that they had not yet obtained expert assistance, we conclude the Defense was not prepared to proceed to a motions hearing, much less trial, during the time between arraignment and the R.C.M 802 conference. As such, 164 days of this 194-day period involved Defense preparation for trial.

---

[12] Accommodations for a military judge's schedule do not excuse the Government from complying with Article 10, UCMJ, so we impute delays by the trial judiciary to the Government. *See, e.g., United States v. Calloway*, 47 M.J 782, 787 (N.M. Ct. Crim. App. 1998).

The motions hearing took three days, and the military judge issued his rulings on the motions before the hearing recessed on the third day. Just before recessing the court, the military judge ascertained the Defense had not yet identified a date they would be ready to proceed to trial, which indicates trial defense counsel were still preparing their case, even at day 418 of Appellant's pretrial confinement.

### d. Weighing the reasons for the delay

In sum, once charges were preferred, the time periods attributable to the Government that are unexplained are: the 16 days between preferral and the Government's ready date for the preliminary hearing; the 12 days it took the Government to transmit the preliminary hearing officer's report to the Defense; the 30-day period between arraignment and detailing of a trial military judge; and the 30-day period between the Defense's ready date for a motions hearing and the actual date of the hearing. These periods amount to a total of 88 days out of the 418 total days Appellant spent in pretrial confinement until his speedy-trial motion was denied. When considering Appellant was not prepared to actually proceed to trial between referral on 16 March 2017 (day 216) and 2 September 2017 (day 386), the period of delay we are left with is 28 days, which consists of the 16 days between preferral and the Government's preliminary hearing ready date and the 12 days to transmit the preliminary hearing report. However, this count of 28 days assumes instantaneous action by the Government, when in reality, we would find it entirely reasonable for the Government to spend some amount of time identifying a qualified preliminary hearing officer, scheduling the preliminary hearing, and coordinating various logistical requirements such as detailing a court reporter, as well as reviewing the preliminary hearing officer's report before delivering it to the Defense. Although we do not discount the seriousness of being deprived of one's liberty for three to four weeks, those days are a very small fraction of the overall 607 days Appellant spent in pretrial confinement, the vast majority of which were with the Defense's stated assent in order to prepare for trial.

Appellant faced serious charges, the investigation into which required specialized forensic investigation and analysis—a point effectively conceded by Appellant by virtue of his insistence his trial team could not be prepared for trial without a battery of expert consultants and a dedicated investigator. Although the Government possessed what it believed was Appellant's journal, Appellant vigorously sought to prevent its use by the Government at trial. Performing investigative steps to directly link the journal to Appellant, to corroborate entries and follow leads in the journal, and to seek evidence independent of the journal sufficient to prove Appellant's guilt should the journal

be ruled inadmissible, are all reasonable and expected investigative steps. *See Cossio*, 64 M.J. at 257.

We conclude, on the whole, the Government proceeded toward Appellant's trial with orderly expedition given the particular circumstances of his case. The majority of the time in which there seemed to be little forward movement in Appellant's case is attributed not to the Government failing to progress with particularized urgency, but to the Defense's unpreparedness not just to proceed to trial, but—in one case—to even discuss dates for a motions hearing.

Appellant makes three arguments as to why the Defense's inability to proceed to trial earlier should be imputed to the Government. First, Appellant argues the case was simple and straightforward, therefore the Government did not need to wait to complete forensic analyses before preferring charges. Second, Appellant argues the Government should have given Appellant expert assistance sooner so that Appellant could prepare for trial. This second argument rests on the notion that the case was so complex that Appellant could not feasibly prepare for trial without substantial expert assistance, while the first is premised on a notion of the utter simplicity of the evidence. If the evidence was as simple as Appellant suggests, the Defense should have been ready to proceed to trial as soon as charges were referred. Instead, 135 days after preferral and 42 days after referral, trial defense counsel were unprepared to even discuss potential dates for a motions hearing. We disagree with the suggestion that this case was simple and that the Government should not have been afforded sufficient time to adequately investigate the case and make principled charging and referral decisions, especially given the gravity of offenses and the potential for a capital referral. The Defense's position that they needed six expert consultants in addition to a dedicated investigator is a concession that the case was complex and required significant time and resources in order to adequately prepare for trial. Indeed, in requesting expert assistance, trial defense counsel repeatedly pointed to the magnitude of the case and the "complex and far-reaching" nature of their trial preparation.

Appellant argues that he should have been provided expert assistance earlier, and had that happened, his trial could have occurred sooner than it did. Appellant initially requested a psychologist on day 38, an investigator on day 41, and a pathologist on day 154. Also on day 154, the Defense requested

reconsideration of their prior requests for a psychologist and investigator.[13] These three requests were denied on day 164—that is, they were denied 126, 123, and 10 days, respectively, after they were submitted by the Defense. The Defense submitted the requests again for the psychologist and pathologist on day 228, and they were ultimately approved on day 245—that is, 207 and 91 days, respectively, after they were originally requested. The investigator was approved on an indeterminate date.[14] The Defense requested four more experts on day 300. The computer forensics and handwriting experts were approved by the Government on days 347 and 356, respectively, and the DNA and fingerprint experts were approved on indeterminate dates.

At a court-martial, the parties "shall have equal opportunity to obtain witnesses and other evidence . . . ." Article 46, UCMJ, 10 U.S.C. § 846. Under R.C.M. 703, an accused submits a request for the employment of expert assistance to the convening authority. R.C.M. 703(d). We are mystified by the Government's waiting for nearly seven months to appoint the requested psychologist to the Defense and likely about the same amount of time for the investigator. Had these experts been appointed to the Defense earlier, trial defense counsel would have had the opportunity to pursue important lines of case preparation much sooner than they were able to. The record is devoid of any meaningful rationale for denying the Defense's first three requests, as they were denied in three near-identical, summary memoranda from the special court-martial convening authority saying he found Appellant had "not provided a sufficient basis under R.C.M. 703(d) to merit approval of [the] request at this stage in the process." The eventual approval of virtually the same requests months later is perplexing, as we can discern no meaningful shift in the evidentiary landscape of the case between the Defense's initial requests, the Government's denial of those requests, and the Government's ultimate approval of those same requests. The Government's four-month delay in even responding to the Defense's psychologist and investigator requests evidences a profoundly lamentable lack of attention to legitimate requests by an Appellant in pretrial confinement facing the possibility of a capital referral. Similarly, we cannot comprehend why the Government required 48 and 56 days to act on the Defense's requests for the computer forensics and handwriting experts, respectively, and presumably about the same

---

[13] As previously noted, there is no indication in the record the convening authority ever took action on the Defense's initial requests.

[14] The Government's answer to Appellant's assignments of error suggests the investigator was also approved on day 245, but we are unable to locate any evidence in the record that specifies the date the investigator was appointed.

amount of time for the DNA and fingerprint experts. Such requests are common in court-martial practice, and the record is silent as to why they were not acted upon sooner. Whatever the reasoning was at the time, the Government fell far short in exercising basic diligence with respect to Appellant's requests for expert assistance.

Despite the Government's dilatory approach to Appellant's requests for the psychologist, pathologist, and investigator, Appellant has no right to have experts appointed to his defense team prior to an order from a military judge. In this case, Appellant never sought a military judge's review of the convening authority's decisions regarding his requests for experts. Moreover, Appellant did not demonstrate at trial and has not demonstrated on appeal that if the psychologist and investigator requests had been granted earlier the Defense would have been prepared to proceed to trial sooner than they were. In fact, the record shows the Defense would *not* have been prepared to proceed earlier by virtue of the Defense requesting four additional experts on day 300—well after the Defense's requests for the psychologist, pathologist, and investigator had been granted. The Defense unambiguously asserted they could not proceed to trial without these four additional experts. We also note trial defense counsel submitted discovery requests on day 381 and day 385, further demonstrating they had not yet completed their investigation and trial preparation some 140 days after the Government granted the Defense requests for a psychologist and pathologist.

The experts requested by the Defense on day 300 pertained to evidence known to the Defense from the outset of the case. For example, the handwriting expert was requested to review the analysis of Appellant's journal, the admissibility of which trial defense counsel was already focused on contesting. The existence of DNA evidence was also readily apparent to trial defense counsel, given that one of the reasons the convening authority had excluded time from the R.C.M. 707 speedy trial clock was to allow the government investigators time to complete DNA analysis.[15] As a result, we conclude trial defense counsel were not only still investigating Appellant's case well past the Government's appointment of a psychologist, pathologist, and investigator to the Defense, but they were investigating avenues known to the Defense prior to preferral. Therefore, trial defense counsel would not have been prepared to proceed to trial even if the Government had acted with appropriate diligence respecting those three requests. This fact, combined with both the

---

[15] In their request for an expert consultant in the field of DNA analysis, trial defense counsel noted they received a copy of the USACIL DNA report at the time of preferral of charges.

motions hearing date being set based upon trial defense counsel's availability and the lack of evidence the Defense sought to either take advantage of the earlier dates offered by the military judge or to propose other, earlier dates, leads us to conclude Appellant's trial would not have occurred sooner had the Government more expeditiously acted on the Defense's first three expert requests. In other words, the Government's actions respecting these expert requests did not operate to delay Appellant's trial.

Appellant's third argument, which he makes for the first time on appeal, is that the Government failed to adequately staff trial defense services so that his trial defense counsel could have been available to go to trial sooner. Appellant, however, has not provided any evidence his trial defense counsel's preparation and availability for trial were impacted by personnel shortages in the Air Force's trial defense function, and we cannot find any support for this allegation in the record of trial. To the contrary, Appellant's trial defense counsel recounted the many times they visited Appellant while he was in pre-trial confinement. The senior defense counsel assigned to Appellant's case was stationed in Texas, yet he traveled several times to meet personally with Appellant in Nebraska to prepare his case, undercutting Appellant's argument his counsel were too busy with other clients to focus on his case. There is no evidence in the record that trial defense counsel sought to have additional or different counsel detailed to the case, nor is there any evidence Appellant raised any concerns about his counsel's diligence or availability. Had trial defense counsel concluded their representation of Appellant was materially limited by their responsibilities to other clients, the counsel had the affirmative obligation to seek a written waiver of this conflict of interest.[16] The absence of any complaint or request by either Appellant or his counsel with respect to counsel availability during trial preparation in this case is strong evidence trial defense counsel were available to diligently and thoroughly represent Appellant in this complex case with significant punitive exposure. In addition to the lack of evidence supporting Appellant's post-trial complaint about staffing within the defense services, Appellant testified at trial as to his satisfaction with the representation he received. After pleading guilty on 5 April 2018 (day 601), trial defense counsel stated they had sufficient time and opportunity to discuss the case with Appellant. Appellant then told the military judge he had had sufficient time and opportunity to discuss the case with his counsel, and he was satisfied with his counsel's performance.

---

[16] Air Force Rule of Professional Conduct 1.7.

Based upon Appellant's and trial defense counsel's above in-trial assertions in conjunction with the absence of any pretrial complaints or requests by Appellant or his counsel, we conclude there is no evidence staffing issues within the Air Force defense services had any impact on the Defense's ability to proceed to trial sooner than they did in this case. Appellant's argument to the contrary is unsupported and without merit. In total, the reasons for the delay in this case are valid and weigh in favor of the Government.

### 3. Demand for speedy trial

On 7 October 2016 (day 56), Appellant—through his counsel—submitted a discovery request to the Government in which trial defense counsel asserted Appellant's right to a speedy trial under the Sixth Amendment. As discussed above, however, trial defense counsel never objected to the date of the preliminary or motions hearings, never sought to conduct either hearing sooner than they were scheduled, indicated they were unprepared to discuss scheduling on day 258, requested new expert assistance as late as day 300 and additional discovery on day 385, and did not file an objection to a trial date set for 183 days after the motions hearing, all of which undercuts the weight we give to Appellant's speedy trial request. *See, e.g., United States v. Lin*, 78 M.J. 850, 862 (N.M. Ct. Crim App. 2019), *rev. denied*, __ M.J. __, No. 19–0338, 2019 CAAF LEXIS 770 (C.A.A.F. 9 Oct. 2019). Nonetheless, Appellant did make a request for a speedy trial, and he consistently raised the issue in his requests for expert assistance.

### 4. Prejudice to Appellant

Pretrial confinement, alone, is insufficient to establish prejudice to an appellant. *Cooley*, 75 M.J. at 262 (citations omitted). Prejudice is assessed by analyzing the interests that speedy trial rights exist to protect, which are: "(1) preventing oppressive pretrial incarceration; (2) minimizing anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired." *Id.* (citing *Mizgala*, 61 M.J. at 129).

On appeal, Appellant does not identify any particular prejudice he suffered. Appellant has not alleged pretrial confinement proceedings were not followed or that the decision to place him in pretrial confinement was an abuse of discretion. Appellant did not ask to be released from pretrial confinement or otherwise seek review of the decisions to place him into and continue his pretrial confinement. Until this appeal, Appellant did not raise any concerns about the conditions of his confinement, nor is there any indication Appellant experienced any anxiety and concern beyond that experienced by any defendant awaiting trial. While the period of time between Appellant entering pretrial confinement and ultimately being tried was lengthy, he has not established that his pretrial incarceration was oppressive.

Appellant has also not established that his defense was impaired in any way. While we might assume earlier appointment of expert assistance might have assisted Appellant in preparing his case, he has not identified any evidence or theory he was unable to develop during the time that passed. To the contrary, Appellant ultimately had extensive time to make use of the six expert consultants and the investigator he was appointed.

Considering the strength of the evidence against Appellant—including his first-person account of his offenses—and his ultimate guilty plea, which assured him of a life sentence, we cannot identify any prejudice to Appellant's defense resulting from the time that elapsed.

Viewing this case as a whole, the Government exercised reasonable diligence in bringing Appellant to trial, and we will therefore not disturb his conviction.

### III. CONCLUSION

The findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

J. JOHNSON, Senior Judge (concurring in part and in the result):

I agree with my colleagues in the majority that the Government acted with reasonable diligence to bring Appellant to trial in accordance with Article 10, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 810, and I concur in affirming the findings and sentence.[*] However, I write separately because I respectfully do not concur with one facet of the majority opinion. Specifically, contrary to the majority, I find that the first of the four factors articulated in *Barker v. Wingo*, 407 U.S. 514 (1972)—the length of the delay—favors Appellant rather than the Government. *See United States v. Cooley*, 75 M.J. 247, 259 (C.A.A.F. 2016) ("In determining reasonable diligence for the purposes of Article 10, UCMJ, courts must conduct a four-factor analysis articulated in *Barker* . . . ." (citations omitted)).

In some respects, the first *Barker* factor occupies an awkward position in the analysis of whether the Government has exercised reasonable diligence in

---

[*] All references in this opinion to the Uniform Code of Military Justice are to the *Manual for Courts-Martial, United States* (2016 ed.).

bringing to trial an accused held in pretrial confinement. The United States Court of Appeals for the Armed Forces (CAAF) has long held that the length of the pretrial delay "'is to some extent a triggering mechanism,' and unless there is a period of delay that appears, on its face, to be unreasonable under the circumstances, 'there is no necessity for inquiry into the other factors that go into the balance.'" *United States v. Cossio*, 64 M.J. 254, 257 (C.A.A.F. 2007) (quoting *United States v. Smith*, 94 F.3d 204, 208–09 (6th Cir. 1996)). However, more recent CAAF decisions have made clear that there is more to the first factor than a binary question of whether or not a delay is facially unreasonable. *See Cooley*, 75 M.J. at 259–60 (finding that, under the circumstances, a 289-day pretrial delay "weighs heavily in favor of" the appellant). Furthermore, hypothetically, it stands to reason that a facially unreasonable 418-day pretrial delay would be more offensive to Article 10, UCMJ, than, for example, a 200-day facially unreasonable pretrial delay, and consequently the length of the delay itself would weigh more heavily in favor of an appellant, if other factors are equal.

Yet the analysis is more complex, because the CAAF has clarified there is more to the first factor than the mere number of days of pretrial delay. As the majority opinion notes, a court is also required to consider, *inter alia*, the seriousness of the offense, the complexity of the case, the availability of proof, whether the appellant was informed of the alleged offenses, and whether the Government complied with pretrial confinement procedures. *Id*. at 260 (quoting *United States v. Schuber*, 70 M.J. 181, 188 (C.A.A.F. 2011)). However, the CAAF has also admonished that the first factor "is not meant to be a *Barker* analysis within a *Barker* analysis," *Schuber*, 70 M.J. at 188; it is distinct from the reasons for the delay, which constitute the second factor.

As I understand the majority's opinion, my colleagues accept the framework described above for analyzing the first *Barker* factor, the length of the delay. In applying it, the majority concludes that although the 418-day delay from the initiation of pretrial confinement to the military judge's denial of the Defense's Article 10 motion was *facially* unreasonable, *substantively* the length of the delay favors the Government in light of the particular circumstances of the case.

I agree with the majority that the length of the delay as a trigger for the application of the *Barker* factors is distinct from the substantive weight of the length of delay in light of the circumstances of the case. I further agree in principle that, as the majority finds here, the *Barker* analysis may be triggered by a facially unreasonable delay, yet upon examination the length of the delay in fact favors the Government when weighed substantively in a particular case. *See United States v. Lin*, 78 M.J. 850, 860–61 (N.M. Ct. Crim. App. 2019) (finding a 249-day delay "sufficient to trigger analysis of the

*Barker* factors" but concluding the delay was "not unreasonable" under the circumstances of the case), *rev. denied*, __ M.J. __, No. 19–0338, 2019 CAAF LEXIS 770 (C.A.A.F. 9 Oct. 2019). However, I do not agree with the majority that Appellant's case is such a case, for three reasons.

First, apart from consideration of the specific reasons for the delay, Appellant was subjected to an unusually long pretrial delay for an accused held in pretrial confinement. The 418-day delay at issue here is significantly longer than the periods addressed in any of the cases cited in the majority opinion. Therefore, as a factor within a factor, I find the sheer length of the delay tends to favor Appellant.

Second, although I agree with the majority that Appellant's case was somewhat complex in certain respects, it was uncomplicated in other respects. Four days after the murder, Appellant sent a text message to another Airman that, in context, was effectively an admission to involvement in killing A1C Dillard. Certainly by the time the Air Force Office of Special Investigations (AFOSI) obtained Appellant's journal on or about 12 August 2016, the Government was in possession of evidence that left little doubt that Appellant had killed A1C Dillard with premeditation and then deserted—the two acts for which he was eventually prosecuted and convicted.

Third, although the complicating factors the majority cites do much to explain the initial four-month delay between the initiation of pretrial confinement and the preferral of charges on 13 December 2016, I find they do little to explain the subsequent delay. By 13 December 2016, the AFOSI had received all the forensic analyses of the evidence it had collected. Furthermore, the Government was sufficiently confident with its evidence to proceed with preferral of the charges and specifications, which remained unchanged throughout the ensuing court-martial process. The post-preferral delays were largely matters of procedure and scheduling, and I believe they are more appropriately analyzed under the second *Barker* factor, the reasons for the delay.

Appellant's offenses were undeniably severe, and a careful and thorough investigation was certainly warranted. However, most of the very lengthy pretrial delay was evidently not attributable to the complexity of proof or the availability of evidence. Therefore, I find the first *Barker* factor favors Appellant.

Nevertheless, I agree with the majority that the reasons for the delay favor the Government, and I find the absence of prejudice strongly favors the

Government. Accordingly, I join my colleagues' conclusion that, viewing the case as a whole, the Government exercised reasonable diligence in bringing Appellant to trial and did not violate Article 10, UCMJ.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court